IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| CAPE FLATTERY LIMITED, | ) | CIVIL NO. 08-00482 JMS/KSC |
| | ) | |
| Plaintiff, | ) | ORDER DENYING DEFENDANT'S |
| | ) | MOTION TO COMPEL |
| vs. | ) | ARBITRATION |
| | ) | |
| TITAN MARITIME LLC dba TITAN | ) | |
| SALVAGE, A CROWLEY | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## ORDER DENYING DEFENDANT'S MOTION TO COMPEL ARBITRATION

## I. INTRODUCTION

Plaintiff Cape Flattery Limited ("Plaintiff") alleges that Defendant Titan Maritime, LLC dba Titan Salvage, a Crowley Company ("Defendant") was grossly negligent in salvaging Plaintiff's boat, the M/V CAPE FLATTERY ("the Vessel"), and seeks indemnity or contribution from Defendant under the Oil and Pollution Act of 1990 ("OPA 90"), 33 U.S.C. § 2701 et seq.

Currently before the court is Defendant's Motion to Compel Arbitration. The parties had entered into an Agreement to salvage the Vessel (the "Agreement"), which provides that disputes arising under the Agreement shall be settled by arbitration in London, England with English law and practice to apply.

Defendant argues that this dispute is subject to arbitration because, applying English law, this dispute "arises under" the Agreement.  Based on the following, the court finds that federal law applies to determining arbitrability of this dispute and that the dispute does not "arise under" the Agreement.  The court therefore DENIES Defendant's Motion to Compel Arbitration.

## II.  BACKGROUND

### A.    Factual Background

On February 2, 2005, the Vessel ran aground on a submerged reef off Barbers Point, Oahu, Hawaii.  Compl. ¶ 4.  In response, the United States Coast Guard issued a Notice of Federal Interest in connection with the grounding of the Vessel and activated United Command to respond to the threat of oil discharge.  *Id.* ¶ 5.  On February 4, 2005, Pacific Basin Shipping (HK) Ltd., acting on behalf of Plaintiff as owner of the Vessel, signed the Agreement for Defendant to salve the Vessel.  *See* Def.'s Ex. A.

Pursuant to the Agreement, the parties agreed that Titan will "use its best endeavors to salve, as quickly as reasonably practicable, [the Vessel] . . . and deliver the [Vessel] to a Place of Safety as aforesaid, and to perform such other

services as may be mutually agreed upon by the Owners and Titan . . . ."[1]  *Id.* ¶ 1.

At paragraph 17, the Agreement provides:

> Arbitration:
> Any dispute arising under this Agreement shall be settled by
> arbitration in London, England, in accordance with the English
> Arbitration Act 1996 and any amendments thereto, English law
> and practice to apply.

*Id.* ¶ 17.

Subsequently, Defendant participated in removing the Vessel from

the reef and eliminating the threat of oil discharge.  Plaintiff alleges that

Defendant acted with gross negligence by using tugs with submerged heavy tow

lines which damaged the coral reef, even though Defendant was expressly warned

not to use such tow lines and had previously used floating tow lines that would not

cause coral damage.  Compl. ¶¶ 8-11.  On February 10, 2005, the United States

Coast Guard designated Plaintiff, pursuant to OPA 90, the responsible party for

costs and damages arising from the response to the oil spill threat.[2]  *Id.* ¶ 13.  On

---

[1]  The Agreement provides that Defendant shall salve the Vessel "by means of the personnel and equipment specified in Schedule 2."  Def.'s Ex. A ¶ 1.  The parties have represented that the Agreement contains a Schedule 2, *see* Def.'s Supplemental Br. 1-2; Pl.'s Supplemental Br. 1-2, but make no arguments that it impacts the arbitrability analysis.

[2]  OPA 90, 33 U.S.C. § 2702(a), provides that a "responsible party for a vessel . . . which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages . . . that result from such incident."  Covered removal costs and damages include, among other things, removal costs incurred by the United States, damages for injury or loss of natural resources and

(continued...)

August 8, 2008, Plaintiff was informed that it may be liable for restoration of the coral in an amount in excess of $15 million.  *Id.* ¶ 15.

## B.   Procedural Background

On October 24, 2008, Plaintiff filed its Complaint seeking indemnity and/or contribution from Defendant and injunctive relief enjoining Defendant from requesting arbitration of Plaintiff's claims.  On December 17, 2008, Defendant filed its Motion to Compel Arbitration.  Plaintiff filed its Opposition on January 9, 2009, and Defendant filed its Reply on January 16, 2009, where it raised for the first time that the Agreement and arbitrability provision must be construed pursuant to English law.

A hearing was held on January 20, 2009.  During the hearing, the court ordered supplemental briefing regarding, among other issues, whether the court must apply English law to determine arbitrability of this dispute.  Defendant submitted its Supplemental Brief on February 2, 2009, and Plaintiff submitted its Supplemental Opposition on February 17, 2009.

///

///

---

[2](...continued)
subsistence use of natural resources, and net costs of providing increased or additional public services during or after removal activities.  33 U.S.C. § 3702(b).

### III.  <u>STANDARD OF REVIEW</u>

The parties agree that the Agreement is governed by the United

Nations Convention on the Recognition and Enforcement of Foreign Arbitral

Awards (the "Convention").  *See* Def.'s Supplemental Br. 3; Pl.'s Supplemental

Opp'n 2.  The Convention must be enforced according to its terms pursuant to the

enabling legislation adopted by Congress -- Chapter 2 of the Federal Arbitration

Act ("FAA"), 9 U.S.C. §§ 201-208, and any provisions of Chapter 1 of the FAA, 9

U.S.C. § 1 et seq., which do not conflict with the Convention.[3]  *See* 9 U.S.C.

§ 208; *see also Rogers v. Royal Caribbean Cruise Line*, 547 F.3d 1148, 1152-53

(9th Cir. 2008) (describing the three chapters of the FAA).

Article II of the Convention provides:

> Each Contracting State shall recognize an agreement in writing
> under which the parties undertake to submit to arbitration all or
> any differences which have arisen or which may arise between
> them in respect of a defined legal relationship, whether
> contractual or not, concerning a subject matter capable of
> settlement by arbitration.

Convention Art. II, ¶ 1, 9 U.S.C. § 201.  Thus, the court may compel arbitration

only if there is "an agreement in writing" and this agreement "undertake[s] to

---

[3]  Because Chapter 2 of the FAA incorporates those provisions of Chapter 1 that do not conflict, the court applies relevant caselaw discussing both Chapters 1 and 2 of the FAA.  *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985) (performing single analysis for determining arbitrability of claims pursuant to Chapter 1 and Chapter 2).

5

submit [the dispute] to arbitration."

"[T]he first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute.  The court is to make this determination by applying the 'federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act.'" *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc*., 473 U.S. 614, 626 (1985) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp*, 460 U.S. 1, 24 (1983)).  In making this determination, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability."  *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25; *see also Mitsubishi Motors Corp.*, 473 U.S. at 631 (noting that strong policy favoring arbitration "applies with special force in the field of international commerce"); *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974) (noting that the goal of the Convention as well as the purpose of its implementation by Congress is "to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate" are enforced).  Factual allegations need only "'touch matters' covered by the contract containing the arbitration clause" for

6

arbitration to be triggered. *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721 (9th Cir. 1999) (quoting *Mitsubishi Motors Corp.*, 473 U.S. at 624 n.13).

Courts specifically determining arbitrability under the Convention ask four questions:

> (i) Is there an agreement in writing to arbitrate the subject of the dispute? *See* Convention, Article II §§ 1-2; (ii) Does the agreement provide for arbitration in the territory of a signatory of the Convention? *See* Convention, Article I §§ 1 & 3; 9 U.S.C. § 206; (iii) Does the agreement arise out of a legal relationship, whether contractual or not, which is considered as commercial? *See* Convention, Article I § 3; 9 U.S.C. § 202; (iv) Is a party to the agreement not an American citizen, or does the commercial relationship have some reasonable relation with one or more foreign states? *See* 9 U.S.C. § 202.

*Chloe Z Fishing Co. v. Odyssey Re (London) Ltd.*, 109 F. Supp. 2d 1236, 1243 (S.D. Cal. 2000) (collecting cases).[4] If the answer to each of these questions is "yes," then the court "shall" refer the parties to arbitration. *See* Convention Art. II, ¶ 2, 9 U.S.C. § 201.

///

///

_____

[4] The first question appears to parallel the inquiry under Chapter 1 of the FAA of determining "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *See Lowden v. T-Mobile USA, Inc.*, 512 F.3d 1213, 1217 (9th Cir. 2008); *see also Brown v. Dillard's, Inc.*, 430 F.3d 1004, 1010 (9th Cir. 2005) (stating that the court must inquire whether (1) there exists a valid agreement to arbitrate; (2) the parties' dispute falls within their arbitration agreement; and (3) there exists "a defense that would be available to a party seeking to avoid the enforcement of any contract").

# IV.  **DISCUSSION**

The only issue the parties dispute is whether Plaintiff's claims fall within the scope of the arbitration clause of the Agreement.[5]  To address this question, however, the court must first determine whether federal or English law applies to determining arbitrability, and then determine the scope of the arbitration clause under the applicable law.

## A.    **Choice of Law**

Defendant argues that the court must apply English law to determine whether the present dispute falls within the scope of the arbitration clause because the Agreement provides that English law should apply to any arbitration.  Def.'s Supplemental Br. 2-6.  In opposition, Plaintiff argues that federal law should apply because there is a strong presumption in favor of federal law which the Agreement does not rebut.  Pl.'s Supplemental Opp'n 3-10.  Based on the following, the court finds that federal law applies.

As a starting point, the court recognizes that in determining the scope of an agreement to arbitrate governed by the FAA, the court must apply the "'federal substantive law of arbitrability, applicable to any arbitration agreement

---

[5]  Regarding the other inquiries, the Agreement provides for arbitration in the territory of a signatory of the Convention (England), the Agreement arises out of a commercial, legal relationship, and Plaintiff is a Chinese corporation.

within the coverage of the [FAA].'" *Mitsubishi Motors Corp.*, 473 U.S. at 626

(quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24).  A number of courts have

applied this mandate "regardless of choice-of-law and arbitration clauses

referencing foreign law."  *Sea Bowld Marine Group, LDC v. Oceanfast Pty, Ltd.*,

432 F. Supp. 2d 1305, 1312 (S.D. Fla. 2006) (discussing and citing various cases);

*see also Becker Autoradio U.S.A., Inc. v. Becker Autoradiowerk GmbH*, 585 F.2d

39, 43 (3d Cir. 1978) ("[I]f the parties agree that certain disputes will be submitted

to arbitration and that the law of a particular jurisdiction will govern the resolution

of those disputes, federal courts must effectuate that agreement.  However,

whether a particular dispute is within the class of those disputes governed by the

arbitration and choice of law clause is a matter of federal law." (citations

omitted)); *Boston Telecomm. Group., Inc. v. Deloitte Touche Tohmatsu*, 278 F.

Supp. 2d 1041, 1047 (N.D. Cal. 2003) (applying federal law even though

agreement included British Columbia choice-of-law provision); *Chloe Z Fishing

Co.*, 109 F. Supp. 2d at 1252 (finding that Chapter 2 of the FAA and the

Convention provide an "overriding basis" for applying federal law); *Westbrook

Int'l, LLC v. Westbrook Techs., Inc.*, 17 F. Supp. 2d 681, 683 (E.D. Mich. 1998)

("[E]ven in international agreements, the FAA governs the arbitrability of claims

and choice-of-law clauses will be applied to the substantive aspects of the

9

arbitration proceedings."). *But see Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 51 (2d Cir. 2004) (applying foreign law pursuant to a choice-of-law provision because "respecting the parties' choice of law is fully consistent with the purposes of the FAA," and also "ensure[s] uniform interpretation and enforcement of that agreement and to avoid forum shopping").[6]

As explained by one court, "while [choice-of-law provisions] are relevant to the substantive law to be used, and the location of arbitration, they say nothing, and mean nothing, as to the threshold issue of arbitrability." *Sea Bowld Marine Group, LDC*, 432 F. Supp. 2d at 1312. Stated differently, the "application of the federal law is consistent with the parties intent, insofar as the choice-of-law provision or the forum selection clause in an international arbitration agreement is not rendered superfluous, but referred to the arbitration panel for resolution." *Chloe Z Fishing Co.*, 109 F. Supp. 2d at 1253.

While the majority of cases suggests a bright-line rule that the court should apply federal law in determining arbitrability of an agreement governed by

---

[6] Cases cited by Defendants are irrelevant to the choice-of-law analysis because they either do not involve arbitration agreements, *see Batchelder v. Kawamoto*, 147 F.3d 915 (9th Cir. 1998) (discussing contract choice-of-law provision); *Richards v. Lloyd's of London*, 135 F.3d 1289 (9th Cir. 1998) (same); *Milanovich v. Costa Crociere, S.p.A.*, 954 F.2d 763 (D.C. Cir. 1992) (same); *Siegelman v. Cunard White Star Ltd.*, 221 F.2d 189 (2d Cir. 1955) (same); *Jansson v. Swedish Am. Line*, 185 F.2d 212 (1st Cir. 1951) (same), or do not involve a *foreign* choice-of-law provision. *See Ford v. NYLCare Health Plans of the Gulf Coast, Inc.*, 141 F.3d 243 (5th Cir. 1998) (discussing whether to apply state law choice-of-law provision in arbitration agreement).

Chapter 2 of the FAA regardless of any choice-of-law provision, the facts of this action do not test the boundaries or applicability of such rule.  Unlike the choice-of-law provisions discussed in cases developing this rule,[7] the Agreement does not actually contain a choice-of-law provision governing *interpretation* of the agreement to arbitrate or even the Agreement as a whole.  Rather, the Agreement provides only that disputes arising under the Agreement are subject to arbitration, which will occur in England pursuant to English law:

> Any dispute arising under this Agreement shall be settled by arbitration in London, England, in accordance with the English Arbitration Act 1996 and any amendments thereto.  English law and practice to apply.

Def.'s Ex. A ¶ 17.  While the Agreement states that English law applies to disputes that are subject to arbitration, the Agreement is silent regarding what law applies to *determine* whether a dispute is subject to arbitration.  Because the Agreement is

---

[7] *See, e.g.*, *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 43 (2d Cir. 2004) (applying Swiss law where agreements provided that they "'shall be governed by, and shall be construed in accordance with Swiss law,' and that the parties agree to arbitrate all disputes 'arising between the Parties out of or in connection with this Agreement' before a three-member arbitration panel in Switzerland in accordance with the International Arbitration Rules of the Zurich Chamber of Commerce"); *Chloe Z Fishing Co. v. Odyssey Re (London) Ltd.*, 109 F. Supp. 2d 1236, 1253 n.12 (S.D. Cal. 2000) (applying federal law despite choice-of-law provision stating that the agreement "shall be governed by, and construed in accordance with English law"); *Sea Bowld Marine Group, LDC v. Oceanfast Pty, Ltd.*, 432 F. Supp. 2d 1305, 1308 (S.D. Fla. 2006) (applying federal law despite choice-of-law provision providing that "[t]his Agreement shall be governed by and construed in accordance with the applicable laws of the State of Western Australia and the Commonwealth of Australia and all the parties hereto agree to submit to the courts of Western Australia and the Commonwealth of Australia having jurisdiction").

silent as to what law should apply to determining the scope of the arbitration clause, the court sees no reason not to follow the Supreme Court's instruction that the court should apply the "'federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the [FAA].'" *Mitsubishi Motors Corp.*, 473 U.S. at 626 (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24). Accordingly, the court finds that federal law applies to determining whether the parties agreed to arbitrate the present dispute.

**B.      Breadth of the Arbitration Clause**

Applying federal law, the court next determines the scope of the arbitration clause.

The Agreement provides that "[a]ny dispute arising under this Agreement shall be settled by arbitration in London, England . . . ." Def.'s Ex. A ¶ 17.   The Ninth Circuit has expressly held that an arbitration agreement including the phrase "arising under" is "relatively narrow as arbitration agreements go" and signals an intent to cover a narrow "scope of disputes, *i.e.*, only those relating to the interpretation and performance of the contract itself." *Mediterranean Enters., Inc. v. Ssangyong Constr. Co.*, 708 F.2d 1458, 1464-65 (9th Cir. 1983) (citation and quotation signals omitted); *Tracer Research Corp. v. Nat'l Env. Serv. Co.*, 42 F.3d 1292, 1295 (9th Cir. 1994); *see also Priyanto v. M/S AMSTERDAM*, 2007

12

WL 4811854, at *8 (C.D. Cal. Sept. 10, 2007) ("It is well-established that when parties use the phrase 'arising under' in an arbitration agreement, they intend to narrow the range of disputes subject to arbitration . . . ."); *YP Corp., Inc. v. Sitrick & Co.*, 2005 WL 3334326, at *6 (D. Ariz. Dec. 8, 2005) ("Courts give a much narrower interpretation to agreements to arbitrate disputes 'arising under' an agreement that omit any reference to disputes or claims 'relating to' the agreement."); *Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 807 (N.D. Cal. 2004) ("The rule is that, where an arbitration clause applies to matters 'arising under' the agreement, its scope is narrowly defined, but where it applies to matters 'arising out of or relating to' the agreement, its application should be broadly construed.").

In *Mediterranean*, the Ninth Circuit came to this conclusion in construing what it considered a synonymous phrase to "arising under" -- "arising hereunder."  The plaintiff, a California company, signed a "Preliminary Agreement" to form a joint venture with the defendant, a Korean contractor, which required that "'[a]ny disputes arising hereunder or following the formation of joint venture shall be settled through binding arbitration . . . .'"  *Mediterranean Enters.*, 708 F.2d at 1461.  The parties never formed the joint venture, raising the question whether the plaintiff's claims for breach of contract, breach of fiduciary duty,

inducing and conspiracy to induce breach of contract, quantum meruit, and conversion, were subject to arbitration. *Id.* Relying on *In re Kinoshita & Co.*, 287 F.2d 951, 953 (2d Cir. 1961), *Mediterranean* found that "arising hereunder," like "arising under," was more narrow than "arising out of or relating to," which contemplates a broad agreement to arbitrate. *Mediterranean Enters.*, 708 F.2d at 1464. The omission of "relating to" in "arising hereunder" was significant, giving the court "no difficulty" in concluding that the agreement to arbitrate covered only a narrow scope of disputes. *Id.* Applying this standard, *Mediterranean* concluded that claims which did not "directly relate to the interpretation and performance of the Agreement itself," including the plaintiff's claims for breach of a separate contract, quantum meruit, and conversion, were not subject to arbitration. *Id.* at 1464-65.

Although *Mediterranean* appears to directly control construction of the arbitration clause in the Agreement and dictates that the court construe its scope narrowly, Defendant nonetheless argues otherwise. Specifically, Defendant claims that the court should not apply *Mediterranean* because subsequent Supreme Court cases emphasize the strong federal policy favoring resolution of disputes by arbitration and the Ninth Circuit has declined to follow *Mediterranean* in subsequent cases. Def.'s Mot. 12-14. The court rejects this argument.

14

As an initial matter, *Mediterranean* is directly applicable to the arbitration clause in this action.  *Mediterranean* construed the scope of "arising hereunder," and found it to be "synonymous" with "arising under," both of which it found were narrow agreements to arbitrate.  *See Mediterranean*, 708 F.2d at 1464; *Tracer Research*, 42 F.3d at 1295 ("In *Mediterranean Enterprises* we found an arbitration clause that covered disputes 'arising under' an agreement, but omitted reference to claims 'relating to' an agreement, covered only those disputes 'relating to the interpretation and performance of the contract itself.'").  *Mediterranean* is therefore a binding decision on this court unless the Ninth Circuit overrules it en banc or "a subsequent decision by a relevant court of last resort either effectively overrules the decision in a case 'closely on point' or undercuts the reasoning underlying the circuit precedent rendering the cases 'clearly irreconcilable.'"  *United States v. Gonzalez-Zotelo*, ---F.3d---, 2009 WL 37144, at *3 (9th Cir. Jan. 8, 2009) (quoting *Hulteen v. AT & T Corp.*, 498 F.3d 1001, 1009 (9th Cir. 2008)).  None of these circumstances applies.

The Ninth Circuit has not overruled *Mediterranean* en banc and the court could not find (and the parties do not cite) any Supreme Court opinion interpreting "arising under" or similar language in an arbitration agreement

15

contrary to *Mediterranean*.[8]  Further, subsequent Supreme Court opinions

emphasizing a strong policy in favor of arbitration, especially in international

commerce, are not clearly irreconcilable with *Mediterranean*.  *Mediterrean*

effectively provides an option for contracting parties should they seek a limited

agreement to arbitrate, which is not clearly irreconcilable with this federal policy.

*See also S.A. Mineracao da Trindade-Samitri v. Utah Int'l, Inc.*, 745 F.2d 190,

194 (2d Cir. 1984) (stating that *Kinoshita* is still good law because  "contracting

parties may have (in theory at least) relied on [*Kinoshita*] in their formulation of

an arbitration agreement").  Indeed, *Mediterranean* expressly took into

consideration the strong federal policy favoring enforcement of arbitration

agreements in international business transactions and found it reconcilable with

the principle that arbitration is a matter of contract, *Mediterranean*, 708 F.2d at

_____

[8]  Defendant takes its argument so far as to argue that *Simula* all but overruled
*Mediterranean* when it explained that "an arbitration clause not enforced in *Mediterranean*
would be interpreted more expansively and enforced under the admonition of *Moses H. Cone*."
Def.'s Mot. 13.  *Simula* made no such statement.  Rather, *Simula* discussed that *Republic of
Nicaragua* relied on *Mediterranean* to find that an arbitration clause containing the phrase "any
and all disputes arising under the arrangements contemplated hereunder" must be interpreted
liberally to encompass a breach of contract claim.  *See Simula Inc. v. Autoliv, Inc.*, 175 F.3d 716,
720 (9th Cir. 1999) (discussing *Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469 (9th
Cir. 1991)).  Such holding is not inconsistent with *Mediterranean*, which found that the
plaintiff's claim for breach of contract was subject to the narrow agreement to arbitrate.  *See
Mediterranean Enter., Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1464 (9th Cir. 1983).  In any
event, neither *Simula* nor *Republic of Nicaragua* involved an agreement to arbitrate including the
limited language of this Agreement -- "any dispute arising under this Agreement" -- as addressed
by *Mediterranean*, and the three-judge panel in *Simula* could not overrule the three-judge panel
in *Mediterranean*.

1463, and subsequent Ninth Circuit cases have relied on *Mediterranean* despite this policy consideration.  *See Tracer Research*, 42 F.3d at 1295 (applying *Mediterranean* to determine that parties did not agree to arbitrate misappropriation of trade secrets claim where agreement used "arising out of" language); *Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 479 (9th Cir. 1991) ("Under *Mediterranean* and *Cone*, we hold that Paragraph IV's commitment to arbitrate 'any and all disputes arising under the arrangements contemplated hereunder' is arguably susceptible of an interpretation that the parties agreed to arbitrate [a breach of contract claim].").

        In finding that *Mediterranean* is binding law, the court recognizes the "clear federal policy in favor of arbitration," *see Simula*, 175 F.3d at 719, and that *Kinoshita*, the Second Circuit case upon which *Mediterranean* relies, has since been limited to its facts due to this policy favoring arbitration.  *See ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 32-33 (2d Cir. 2002) ("*Kinoshita*, which was decided before the Supreme Court's more recent decisions emphasizing the strong federal policy in favor of arbitration, has frequently been criticized in this Circuit, and no decision of recent vintage mentions the case without confining it to its precise facts."); *S.A. Mineracao*, 745 F.2d at 194 (declining to overrule *Kinoshita* "despite its inconsistency with federal policy

17

favoring arbitration").[9]  If writing on a clean slate in the Ninth Circuit, this guidance might be persuasive in interpreting "arising under" more broadly; however, the court is bound by *Mediterranean*.

Applying *Mediterranean*, the court therefore finds that the parties' agreement to arbitrate "[a]ny dispute arising under this Agreement" is narrow, and reaches only those disputes between the parties that relate to the interpretation and performance of the Agreement itself.

## C.     The Scope of the Arbitration Clause

To determine whether Plaintiff's claims fall within the scope of the agreement to arbitrate, the court must next "determine the extent to which the counts against [Defendant] refer to disputes or controversies relating to the interpretation and performance of the contract itself." *Mediterranean*, 708 F.2d at 1464.  This analysis draws a line between claims that are directly related to the agreement to arbitrate, versus those that are "predominately unrelated to [] conflict over the interpretation and performance of the Agreement." *Id.* at 1464.  Claims are not covered by a narrow agreement to arbitrate where they relate "only

---

[9]  The court is also aware that other circuits have explicitly "declined to follow *Kinoshita* [and *Mediterranean*] in light of the strong federal policy in favor of arbitration." *See Highlands Wellmont Health Network, Inc. v. John Deere Health Plan, Inc.*, 350 F.3d 568, 577 (6th Cir. 2003) (citing *Battaglia v. McKendry*, 233 F.3d 720, 726-27 (3d Cir. 2000)); *Gregory v. Electro-Mechanical Corp.*, 83 F.3d 382, 385 (11th Cir. 1996); *Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l, Ltd.*, 1 F.3d 639, 641 (7th Cir. 1993); and *Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.*, 867 F.2d 809, 813 (4th Cir. 1989).

peripherally to the [agreement to arbitrate]" or raise "issues largely distinct from the central conflict over the interpretation and performance of the [agreement to arbitrate] itself." *Id.* at 1464-65. Further, the "[t]he fact that the tort claim would not have arisen 'but for' the parties' [] agreement is not determinative." *Tracer Research*, 42 F.3d at 1295. The court therefore begins with an analysis of Plaintiff's claims.

Plaintiff alleges claims against Defendant for indemnity and/or contribution for the damage Defendant caused during the salve of the Vessel and for which Plaintiff is strictly liable. Compl. ¶¶ 18-19. Specifically, Plaintiff alleges that Defendant was grossly negligent in salving the Vessel by using tugs with submerged heavy tow lines which damaged the coral reef even though Defendant was expressly warned not to use such tow lines and had previously used floating tow lines that would not cause coral damage. Compl. ¶¶ 8-11. The United States Coast Guard, pursuant to OPA 90, designated Plaintiff the responsible party for these damages, meaning that Plaintiff is liable for the damage to the coral reef and other natural resources. 33 U.S.C. § 3702(a-b). OPA 90, 33 U.S.C. § 2709, in turn permits Plaintiff to "bring a civil action for contribution against any other person who is liable or potentially liable under this chapter or another law."

Plaintiff asserts that Defendant is liable for a portion of these damages pursuant to federal admiralty law and Hawaii state law.  In general, admiralty law recognizes the right to contribution between joint tortfeasors and liability is apportioned according to fault.  *Hunley v. Ace Maritime Corp.*, 927 F.2d 493, 496 (9th Cir. 1991).  Hawaii recognizes similar rules.  *See* Haw. Rev. Stat. § 663-12.  The elements of a negligence cause of action under admiralty law are essentially the same as those for a Hawaii state law negligence claim and include: "1) the existence of a duty of care owed by the defendant to the plaintiff; 2) the breach of that duty of care; 3) a causal connection between the offending conduct and the resulting injury, which is called 'proximate cause;' and 4) actual loss, injury or damage suffered by the plaintiff."  *Pearce v. United States*, 261 F.3d 643, 647-48 (6th Cir. 2001) (citing 1 Thomas J. Schoenbaum, Admiralty and Maritime Law § 5-2, at 170 (3d ed. 2001)); *see also Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000); *Cho v. State*, 115 Haw. 373, 379 n.11, 168 P.3d 17, 23, n.11 (2007) ("It is well-established that, in order for a plaintiff to prevail on a negligence claim, the plaintiff is required to prove all four of the necessary elements of negligence: (1) duty; (2) breach of duty; (3) causation; and (4) damages.").

Beyond these elements for a negligence claim, to recover damages in this action Plaintiff must prove that Defendant was grossly negligent -- the Clean Water Act shields Defendant, who was participating in removal of a threat of oil discharge, from liability except for gross negligence. *See* 33 U.S.C. § 1321(c)(4)(B)(iv). Gross negligence requires "'the intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another; such a gross want of care and regard for the rights of others as to justify the presumption of willfulness and wantonness.'" *Royal Ins. Co. of Am. v. Sw. Marine*, 194 F.3d 1009, 1015 (9th Cir. 1999) (quoting Black's Law Dictionary 1185 (4th ed. 1968)); *see also Pancakes of Haw., Inc. v. Pomare Props. Corp.*, 85 Haw. 286, 293, 944 P.2d 83, 90 (Haw. App. 1997) (noting that gross negligence has been defined as "[i]ndifference to a present legal duty and utter forgetfulness of legal obligations so far as other persons may be affected" (citation and quotation signals omitted)). Gross negligence "is simply a point on a continuum or probability, and its presence depends on the particular circumstances of each case." *Royal Ins. Co. of Am.*, 194 F.3d at 1015 (citation and quotation signals omitted); *see also Pancakes of Haw., Inc.*, 85 Haw. at 293 ("The element of culpability that characterizes all negligence is in gross negligence magnified to a high degree as compared with that present in ordinary negligence." (quotations

signals and alterations omitted)).

The parties dispute the basis of Defendant's duty in salving the Vessel.  Defendant argues that this dispute is subject to arbitration because its duty arises from the Agreement such that any breach of that duty involves its performance under the Agreement.  In comparison, Plaintiff argues that this dispute is not subject to arbitration because Defendant had an independent duty separate from the Agreement to prevent damage to the coral reef.  The court agrees with Plaintiff.

Whether Defendant owes a duty to Plaintiff "depends on a variety of factors, 'most notably the foreseeability of the harm suffered by the complaining party.'"  *Canal Barge Co.*, 220 F.3d at 377 (quoting *Consolidated Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 67 (5th Cir. 1987)); *see also Doe Parents No. 1 v. State, Dept. of Educ.*, 100 Haw. 34, 72, 58 P.3d 545, 583 (2002) (stating that "if it is not reasonably foreseeable that the particular plaintiff will be injured if the expected harm in fact occurs, the defendant does not owe that plaintiff a duty reasonably to prevent the expected harm").  Indeed, "duty is measured by the scope of the risk that negligent conduct foreseeably entails." *Canal Barge Co.*, 220 F.3d at 377; *see also Doe Parents No. 1*, 100 Haw. at 72, 58 P.3d at 583 ("[I]f the harm is not reasonably foreseeable, the defendant will not be deemed to have

breached the duty of care that he or she owes to a foreseeable plaintiff.").

Based on these principles, the relevant inquiry is whether it was foreseeable to Defendant that Plaintiff would suffer harm as a result of the use of submerged tow lines.  As alleged in the Complaint, Defendant knew that the Vessel was grounded on reef where coral colonies were present and that it would have to use floating tow lines to prevent coral damage.  Compl. ¶ 8.  Because damage to the reef as a result of using submerged tow lines was clearly foreseeable, and because Plaintiff is strictly liable under the law for damage to the reef, the court concludes that a duty of care was owed by Defendant to Plaintiff.[10]

This duty -- to prevent foreseeable damage to the coral reef -- is separate from and above and beyond Defendant's duties under the Agreement.  Indeed, during the hearing, Defendant asserted that it is only arguing that Plaintiff's claims relate to performance of the Agreement, as opposed to requiring

---

[10]  Under Hawaii law, the court may consider a number of factors beyond foreseeability in determining duty.  *See Pulawa v. GTE Haw. Tel.*, 112 Haw. 3, 12, 143 P.3d 1205, 1214 (2006) (discussing that the court must perform a case-by-case analysis, which involves weighing policy considerations and factors including "whether a special relationship exists, the foreseeability of harm to the injured party, the degree of certainty that the injured party suffered injury, the closeness of the connection between the defendants' conduct and the injury suffered, the moral blame attached to the defendants, the policy of preventing harm, the extent of the burden to the defendants and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved" (citation and quotations signals omitted)).  While the parties made no arguments regarding these other factors, consideration of all these factors does not undermine the court's conclusion that Defendant owed a duty to Plaintiff independent and separate from the Agreement.

interpretation of the Agreement.[11]  The parties point to no Agreement provision that Defendant allegedly breached -- the Agreement is silent regarding what tow lines Defendant must use, how precisely Defendant must salve the Vessel, and whether Defendant must take precautions to prevent harm to the coral reef. [12] Simply put, finding a breach of Defendant's duty to prevent foreseeable harm to the reef will not require determining whether Defendant performed under the Agreement.  Defendant's duty to prevent foreseeable harm to the coral reef exists regardless of the Agreement.

       The court's conclusion that Plaintiff's claims sound wholly in tort and do not relate to "the interpretation and performance" of the Agreement is confirmed by the fact that Plaintiff would have the same claims regardless of whether the Agreement existed.  While it is true that Defendant salved the Vessel pursuant to the Agreement, these same circumstances could have arisen if Defendant salved the Vessel as a volunteer or if the government hired Defendant.

---

[11]  Accordingly, to the extent that any of Defendant's arguments could be construed as asserting that the dispute relates to interpretation of the Agreement, the court deems those arguments waived.

[12]  The court also recognizes that even if the Agreement required Defendant to take care in salving the Vessel, the Agreement could not change Defendant's liability for any gross negligence -- a party cannot contract out of liability based on gross negligence.  *Royal Ins. Co. of Am. v. Sw. Marine*, 194 F.3d 1009, 1016 (9th Cir. 1999) (finding that "a party to a maritime contract should not be permitted to shield itself contractually from liability for gross negligence").

*See* 33 U.S.C. § 132(c)(1)(B)(i) (granting the President authority to "remove or arrange for the removal of a discharge, and mitigate or prevent a substantial threat of a discharge, at any time").  Under these circumstances, Plaintiff would still be strictly liable for any damages caused by Defendant and Defendant would still have an independent duty to prevent foreseeable damage to corals.

In finding that Defendant had a duty separate from the Agreement, the court recognizes that Defendant would not have salved the Vessel but for the Agreement.  This "but-for" connection to the Agreement, however, is insufficient to make Plaintiff's claims "related to" the performance of the Agreement as required by *Mediterranean* and its progeny.  *Mediterranean* mandates that a narrow agreement to arbitrate does not encompass claims that relate "only peripherally" to the agreement to arbitrate or raise "issues largely distinct from the central conflict over the interpretation and performance of the [agreement to arbitrate] itself."  *Mediterranean*, 708 F.2d at 1464-65.

*Tracer Research* illustrates this point.  *Tracer Research* addressed whether the parties' narrow agreement to arbitrate encompassed a claim for misappropriation of trade secrets, and found that "[t]he fact that the tort claim would not have arisen 'but for' the parties' licensing agreement is not determinative."  *Tracer Research*, 42 F.3d at 1295.  *Tracer Research* concluded

25

that the misappropriation claim was an independent wrong separate from any claim for breach of agreement, and therefore not arbitrable under *Mediterranean*.[13] *Id.*; *see also Mediterranean*, 708 F.2d at 1465 (finding that plaintiff's claim for conversion "appears to raise issues largely distinct from the central conflict over the interpretation and performance of the Agreement itself"); *Priyanto*, 2007 WL 4811854, at *8 (finding claim for failure to pay wages did not arise under the employment contract even though "the Court may ultimately have to look to Plaintiff's contract to determine what wages were owed").

Similar to *Tracer Research* and *Mediterranean*, the mere fact that Plaintiff's claims stem from Defendant's salve of the Vessel pursuant to the Agreement is not sufficient to make them related to the parties' performance under the Agreement. The fact finder need not determine what the Agreement required Defendant to do or whether Defendant adequately performed under the Agreement. Indeed, Plaintiff is not alleging that Defendant breached the Agreement in any respect. Accordingly, the court finds that Plaintiff's claims are

---

[13] Defendant attempts to distinguish *Tracer Research*, arguing that the defendant's alleged wrongful behavior in that case occurred after the parties' agreement ended. *See* Def.'s Mot. 10-11. This factual distinction, however, does not alter *Tracer Research's* core holding -- that torts independent from contract do not arise under a narrow agreement to arbitrate. Further, *Mediterranean* found that the tort of conversion, which arguably would not have occurred "but for" the agreement to arbitrate, raised "issues largely distinct from the central conflict over the interpretation and performance of the Agreement itself." *Mediterranean*, 708 F.2d at 1465.

not subject to arbitration pursuant to the Agreement.

To the extent not already addressed in the analysis above, Defendant's remaining arguments are wholly meritless and/or irrelevant to the issue of whether this dispute is subject to arbitration.  Specifically, Defendant argues that Plaintiff's claims are "misconceived" because the parties are not "joint tortfeasors to the United States under OPA 90 for damages to natural resources." Def.'s Supplemental Br. 10.  Defendant's argument attacks the merits of Plaintiff's claims, *i.e.*, whether Plaintiff can state a claim for indemnity and contribution for its strict liability damages.  Whether Plaintiff can state a claim, however, is a wholly separate inquiry from the present issue before the court, *i.e.*, whether the parties agreed to arbitrate the claims stated in the Complaint.  Whether Plaintiff can state a claim for indemnity and contribution is for the court, not the arbitrator, to determine.

Further, to the extent Defendant's argument can be construed as arguing that Defendant's duty must arise from the Agreement because it had no duty under OPA 90, the court rejects such argument.  OPA 90 did not create Defendant's duty and Plaintiff does not assert that Defendant is a responsible party under OPA 90.  Rather, as contemplated by OPA 90, Plaintiff brings this action seeking indemnity and/or contribution against "any other person who is liable or

27

potentially liable under this chapter or *another law*." 33 U.S.C. § 2709 (emphasis added). That other law, as described above, is federal admiralty and Hawaii state tort law.

For these reasons, the court finds that Plaintiff's claims do not arise from the Agreement but from federal admiralty and Hawaii state law defining this tort. Accordingly, Plaintiff's claims are not subject to arbitration.

## V. <u>CONCLUSION</u>

Based on the above, the court DENIES Defendant's Motion to Compel Arbitration.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, March 19, 2009.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Cape Flattery Ltd. v. Titan Marine LLC*, Civ. No. 08-00482 JMS/KSC, Order Denying Defendant's Motion to Compel Arbitration

28